## Nisi Prius.

# PHILADELPHIA, OCTOBER, 1816.

Commonwealth, ex. rel. Frantz
    Anthon Van Ritter,               } HABEAS CORPUS.
        v.
    John Schultz.

An agreement between the master of a vessel and a passenger, that
    the latter shall remain on board until he has paid his freight. is
    lawful.  He cannot plead as a set off, that the master did not
    furnish the provisions which he stipulated.   These are mutual
    covenants, on which each party may have an action.

TILGHMAN, Ch. J.   It appears by the return to the
habeas corpus, and the evidence which has been given,
that the relator, Frantz Anthon Van Ritter, was a passen-
ger, together with many others, Germans and Swiss, in
the brig Ceres, from Amsterdam to Philadelphia, and
the defendant, captain Schultz, detains him on board
the said brig, now lying in the Delaware, off Philadel-
phia, by virtue of a contract made between the captain
and passengers at Amsterdam, by which the passengers
agreed not to leave the brig without permission of the
captain, until payment of their passage money.   It is
contended by Van Ritter, in the first place, that this con-
tract so far as concerns the engagement not to leave the
brig is illegal and void ; but that even if it were valid,
the captain having not performed his part of the agree-
ment has no right to detain him.

The contract is said to be illegal, because it is oppres-
sive and unconscientious, and because it is against the
public interest and general policy of the country.

It is not pretended that the passengers in this vessel
are to pay more than the usual freight ; or that any de-

ception was put upon them, at the time of entering into the contract. They came on board in the usual way, and made such an agreement for their passage as is commonly made. Having no money, nor being able to find security at Amsterdam, they stipulated not to leave the brig till they had paid for their passage. They knew very well that they could make no money during the passage, nor could they expect to borrow it on their arrival in a strange country. But it was also known that by indenting themselves to serve for a term of years, the money might be raised; and in order to secure the captain who carried them over the sea, and supplied them with provisions, they promised not to leave the brig until they had paid for their passage, which in substance amounted to an engagement to raise the money by indenting themselves before they left the brig. Their object was to advance their fortunes in a new country— an object which had been frequently attained by their countrymen, who had gone to America before them; and it is not easy to conceive any better means of accomplishing their object than those which were taken. Supposing, then, the contract to have been fairly complied with on the part of the captain, I can perceive nothing in it unreasonable and unconscientious; on the contrary, it was advantageous to the emigrants. Having no money, they obtained credit by giving the only security in their power—a security, which, if not abused on the part of the captain, could be productive of no hardship whatever.

But it is said to be against the general policy of our laws and government. If it be so, it must be either because of the indenture of servitude, or because of the right of the captain to detain the passengers until they

PHILAD'A.
1816.

Com'wealth
v.
Schultz.

enter into such indenture. Upon consideration of our laws and customs, it is extremely clear that an indenture of this kind is not only not against our policy, but that it is conformable to the policy and custom which has prevailed from the earliest times. In the case of the Com. v. Keppele, 2 Dal. Rep. 197. this subject was materially considered, as appears from the opinion of Judge Bradford, who, as is well known, was remarkable for deep and accurate research. He states this custom of persons coming from Europe, binding themselves and their children as servants in America, to pay for their passage, as having originated with the first adventurers to Virginia. It arose from the circumstances of the country; and being found eventually beneficial to the merchant and the adventurer, it has never ceased, but was introduced into Maryland and Pennsylvania, which were colonized after Virginia. We find it referred to in our statute book so early as the year 1700; in fact, there was a convenience in it so obvious that it could not be relinquished. It has been the favourite policy of Pennsylvania to encourage, particularly, the importation of Germans. The name of *German Redemptioner,* which implies servitude, is familiar to her laws. Servitude of this kind is no disgrace; and the soundness of the policy which encouraged it is proved by this notorious fact, that many of the Redemptioners, having honestly served out their time, have arisen to eminence both of *character* and *fortune;* and the same remark is applicable to many who have been imported from Great Britain and Ireland. Our laws have paid particular attention to Germans, because we seem to have expected a greater emigration from Germany. than from any other country —because we considered them as a steady, sober, in-

PHILAD'A.
1816.

Com'wealth
v.
Schultz.

dustrious people, remarkably fitted for agriculture—and because, being ignorant of our language, they stand more in need of legislative protection than the emigrants from our mother country. Accordingly, we find that on the 8th of April, 1785, an act was passed " for establishing the office of a register of all German passengers who shall arrive at the port of Philadelphia, and of all indentures by which any of them *shall be bound servants for their freight*, and of the assignment of such *servants* in the city of Philapelphia." This act contained many provisions beneficial to the Germans ; and by another act passed 12th of March, 1810, " all masters or mistresses of German Redemptioners who are minors, and who shall arrive at the port of Philadelphia after the passing of said act, shall give to the said Redemptioners six weeks schooling for every year of his or her *time* of *servitude ;* and it shall be the duty of the register of German passengers, to insert the same fully in their indentures." It cannot be denied, therefore, that this kind of servitude has been recognized and provided for by our laws ; so that it only remains to consider, whether the right to *detain* the *passengers on board* till he pays the money, or, in other words, till he indents himself, is contrary to the genius of our laws or constitution.

If we wish for the importation of Gemans, who have not money to pay their passage, we must permit the merchant who imports them to have security for his freight. Now, in what other way can these people give security than agreeing to remain on ship-board till they indent themselves as servants ? I confess that none has occurred to me, nor has any been suggested by the learned counsel who have argued for the relator. They have said, indeed, that the passenger may agree in Eu-

rope to indent himself on his arrival in America, and the ship owner may sue him if he does not comply with his contract.   But what security is there in that ?   The owner might as well have rested on a simple promise to pay the freight—and what advantage would the *honest* passenger derive from being sued on his contract ?   A fraudulent man, indeed, might think it for his interest to go to gaol, and come out by the insolvent act; but one who meant to act fairly, would rather remain on board till he had raised the money, than to subject himself to an action for the freight merely for the sake of setting his feet on shore a few days sooner.   But it is objected that *private imprisonment* is odious and intolerable.   I grant it, and should not be for ordering it—but how can this be called private imprisonment ?   Have not our laws provided that public officers shall visit the ship and examine the condition of the passengers ?   Is there not free access for the friends of the passengers, for strangers who wish to contract for their service, and for the members of that respectable society whose object and duty it is to afford relief to their countrymen in distress ?   If this access were denied, it might then, indeed, be called a *private imprisonment*, for which this court would give immediate redress.   Supposing then this right of detention to be exercised with mildness and humanity, according to the true meaning of the contract, I perceive nothing in it either inconsistent, oppressive, or impolitic ; and in this sentiment I am supported by an authority no less than the Legislature of the commonwealth; for by an act passed April 22d, 1794, (sect. 13.) " it shall be lawful for the master, captain or owner, or consignee of any ship or vessel, importing passengers into this commonwealth as aforesaid, to keep and detain any such

passengers, who are unable to pay their freight, on board the same ship or vessel wherein they were imported respectively, for the space of thirty days after their arrival opp site the city of Philadelphia, in order that they may have time to find out relations or friends, who may discharge their freight, or to agree with some person or persons, who shall be willing to pay the same in consideration of their servitude for a term of years, *agreeably to custom.*"

The above is part of a law for establishing a health office, &c. The laws concerning the health office are various and complicated—several have been made and several repealed, in whole or in part. As the passage I have cited was not mentioned in the agreement, I presume it was supposed to be repealed. I will not take upon me to assert, positively, that it is not repealed, but after a pretty diligent search, I have not been able to find the repeal. If it be still in force, the right of detention is clear, because the thirty days given by the law have not expired. But even supposing it to be repealed, I am of opinion, for the reasons I have given, that the right still remains, in cases where the contract expressly stipulates for it.

But it is contended that the defendant, by violating his part of the contract, has perfected his right of detention, because the stipulations on his part are in nature of a *condition precedent*, which must be strictly performed before he can have any remedy on the contract. This, however, is not the construction of the agreement. The word *condition*, is, indeed, to be found in it ; but, on the whole, it appears to be an agreement in which there are mutual covenants, on which each party may have an action although he may not have strictly complied with

every *thing* to be done by him.    The captain agrees to bring the passengers to America, and furnish them on each day of the passage with certain articles of provision.   On the other hand, the passengers promise to conduct themselves in an orderly and peaceable manner, and pay their freight at the end of the voyage.   But it never could have been intended that if the captain failed in *some small article* on *one day*, he should, therefore, have *nothing* for bringing the passengers across the Atlantic ; or, that a passenger, by one trifling act of rudeness or misbehaviour, should forfeit all right to the benefit of the agreement.   Van Ritter has been safely brought to America, which is the main point.   For this he certainly must pay something, although he may have claims against the captain for breaches of the contract. Some breaches there certainly have been.   I allude not to those acts of violence, rudeness and indecency done by the officers of the brig (though not by the captain personally) to many of the passengers, and particularly females.   Although I highly disapprove of these things, yet they cannot properly be taken into consideration in the present inquiry.   Personal injuries to others are not the concern of Van Ritter.   For the beating of his wife, indeed, he has an intimate concern, but it is not a wrong of a nature that can be set off against the captain's claim to freight.   But when I say that the contract has been broken, I mean in the article of provisions. Potatoes and vinegar were not furnished at all, and as to the rest, the passengers were put upon short allowance during great part of the voyage.   It is insisted, indeed, by the captain, that this short allowance arose from necessity.   It is a point on which I am not fully satisfied,

but a jury will decide it, if it should ever be brought before them. But granting that there have been breaches of this contract, how can I measure the damages? It is a thing which, without the assistance of a jury, I could not pretend to. The question then is, whether, supposing for argument's sake, the claim of freight to be liable to some deduction, the captain, therefore, forfeits all right to detention. It appears to me that he does not; and that the right of detention remains until the whole balance of freight is paid. The agreement is, that the freight shall be paid and the passengers shall stay on board until it is paid, that is, until the whole is paid. If upon mature reflection it shall be thought by the German society, that this is a case which requires farther investigation, they will no doubt support the passengers in the prosecution of their rights. I see some of the members of that society attending here, and am glad to see them; they may render essential service by making a strict, but *dispassionate* inquiry into the conduct of all captains who arrive at this port with passengers; by discouraging all litigations about trifles, but firmly supporting their countrymen against every species of oppression, and every substantial breach of contract; on their conduct much depends. Their duty is important, and in the discharge of it they may do much good, or much ill. That they will choose the good, I hope; and I have no reason to doubt it. Upon the whole, it is my opinion that Van Ritter should return to the brig, and remain there according to his agreement.